Filed 11/8/24  P. v. Matuzek CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>JOHN TYRONE MATUZEK,<br><br>　　Defendant and Appellant. | H049792<br>(Santa Clara County<br>　Super. Ct. No. C2010040) |

A jury convicted defendant John Tyrone Matuzek of forcible oral copulation (Pen. Code,[1] § 287, subd. (c)(2)(A)) and two counts of misdemeanor battery (§§ 242, 243, subd. (a)) on an 80-year-old woman suffering from dementia.  The trial court denied Matuzek's motion to dismiss two strike prior convictions (strike priors) and sentenced him to 25 years to life in prison.

On appeal, Matuzek contends the trial court erred by admitting evidence of the victim's postcrime statements to her daughter and a nurse about the sexual assault and allowing the prosecutor in closing argument to replay and comment on a video recording of the victim's preliminary hearing/conditional examination testimony admitted in lieu of trial testimony.  Matuzek further contends that these errors cumulatively and prejudicially

---

[1] All further unspecified statutory references are to the Penal Code.

violated his statutory and constitutional rights.  Regarding his sentence, Matuzek asserts the trial court erred by denying his motion to dismiss the strike priors.

For the reasons explained below, we affirm the judgment.

## I.  FACTS AND PROCEDURAL BACKGROUND

### A.  Procedural History

The Santa Clara County District Attorney accused Matuzek of sexually assaulting Shirley Doe[2] on or about July 8, 2020.[3]

At a preliminary hearing held three weeks after the alleged crime (on July 29–30), Shirley testified for the prosecution.  The district attorney requested that Shirley's preliminary hearing testimony be recorded on video and deemed a conditional examination (§ 1339).  The district attorney asserted that Shirley "is 80 years old and is a dependent adult as defined in Penal Code section 1336[, subdivision] (c), having recently been diagnosed with dementia."  The trial court granted the requests.

In July 2021, the district attorney filed a second amended information (information) charging Matuzek with four crimes:  assault with intent to commit rape in the commission of a first degree burglary (§ 220, subd. (b); count 1); rape by force, duress, menace, or fear (§ 261, subd. (a)(2); count 2); and two counts of oral copulation by force, violence, duress, menace, or fear (§ 287, subd. (c)(2)(A); counts 3 & 4).  As to counts 3 and 4, the information alleged that Matuzek committed the charged offense during the commission of a burglary (§ 667.61, subds. (a) & (d)).  The information further alleged that Matuzek had previously been convicted of two strike priors for first degree burglary (§ 1170.12, subd. (b)(1)).

---

[2] Shirley Doe is a partial pseudonym, and we refer to her as Shirley.  Additionally, we refer to other individuals by their first name only to protect their and Shirley's privacy interests.  (See Cal. Rules of Court, rule 8.90(b)(4), (10)–(11).)

[3] Unless otherwise indicated, all dates were in 2020.

At Matuzek's jury trial in July 2021, the trial court admitted redacted versions of the video recording and reporter's transcript of Shirley's preliminary hearing testimony.

After deliberating for approximately seven hours and 20 minutes (between the late afternoon of July 20, 2021, and the morning of July 22, 2021), the jury found Matuzek guilty of one count of oral copulation by force, violence, or fear (count 4 [relating to contact between Matuzek's penis and Shirley's mouth]) but found not true the allegation that Matuzek committed the offense during a burglary. The jury acquitted Matuzek of assault with intent to commit rape in the commission of a first degree burglary (count 1), rape by force, violence, or fear (count 2), and one count of oral copulation by force, violence, or fear (count 3 [relating to contact between Matuzek's mouth and Shirley's vagina]). On counts 2 and 3, the jury found Matuzek guilty of the lesser included offense of simple battery (§§ 242, 243, subd. (a)). Following a bifurcated bench trial, the trial court found true the allegations that Matuzek had been convicted of two strike priors.

Matuzek moved to dismiss the strike priors pursuant to section 1385 and *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*) (hereafter *Romero* motion or motion). At a sentencing hearing held in February 2022, the trial court denied Matuzek's *Romero* motion. The court sentenced Matuzek to 25 years to life in prison on count 4 and ordered him to serve six months in county jail on counts 2 and 3 (with six months credit for time served).

### B. *Evidence Presented at Trial*

#### 1. Prosecution Evidence

Shirley was 80 years old in 2020 and lived alone in an apartment in Campbell. She enjoyed walking and socializing.

Shirley had four daughters, including Tammy, who lived near Sacramento. Tammy visited her mother every third weekend and talked to her daily by phone. Tammy testified that Shirley had been diagnosed with Alzheimer's disease in February 2020, and had stopped driving. According to Tammy, from January 2020, through July

11, 2020, Shirley's condition "was pretty much the same. She was just different." Although Shirley was often lucid, she did not "communicate the same way she used to," "couldn't really show her feelings," could not remember some events, and "would tell stories of young girls being in her living room and keeping her up at night." In July 2020, Shirley's daughters were planning to move Shirley closer to where they lived in the Sacramento area.

### a. Shirley's Preliminary Hearing Testimony

The prosecution played substantial excerpts from Shirley's July 2020 preliminary hearing testimony at trial. At the preliminary hearing, Shirley had testified that on July 8, she went out to shop at a Marshalls department store. As she walked on the trail toward the store, a man with a bicycle who called himself "Johnny Park" (later identified as Matuzek) approached her and said he "wanted to meet [her]." Shirley told him, " 'I've got to go. I have things I've got to do.' " Matuzek asked if he could walk with Shirley, and she told him she was going to the store. Matuzek said he would accompany Shirley.

At the store, Matuzek "was wandering off looking at stuff." He also "was following [Shirley] every step [she] took, and that's not what [she] wanted." He followed Shirley to the front counter and offered to assist with her purchase because she did not have a Marshalls card.

After leaving the store, Matuzek offered to buy Shirley a drink. Shirley waited as Matuzek went to get beverages. After Matuzek returned, he followed Shirley toward her home. She did not invite him to her apartment.[4] Matuzek said he "hope[d] that [Shirley] would . . . go out with him and go shopping if he wanted to and things like that." Shirley told Matuzek that she had to get going, but he followed her all the way home.

---

[4] On cross-examination, Shirley testified that she had invited Matuzek over to her apartment for a sandwich.

Matuzek walked into Shirley's apartment uninvited. Shirley made sandwiches and told Matuzek she was going to take a nap. She asked Matuzek to leave "several times," but he "just acted like he had known [Shirley] for years."[5]

About 30 minutes after Shirley lay down in her bed, Matuzek entered her bedroom. Matuzek "climbed up over [Shirley], and . . . started holding [her] down and taking [her] clothes down, and [she] was [] pushing him and trying to get away from him, which [she had] never had to do in [her] life. And right after that, . . . he was doing other things, and [she] kept telling him, 'Get out of my house now.' [She] said, 'I'm going to call the cops if you don't.' "[6]

Matuzek took off his pants and touched "[a]round [Shirley's] face" with his penis. Shirley testified that Matuzek "was trying to put [his penis] in [her] throat" and "was trying to get [her] to open up [her] mouth." When asked by the prosecutor if Matuzek's penis was in her mouth, Shirley explained that it was "[m]ore like on [her] lips and trying to push" while she was "trying to fight him." Shirley said that Matuzek "was pushing with all his might" and she "couldn't open [her] mouth to scream because there he was. He thought it was funny." Shirley explained, "[M]y mouth was closed. . . . I just kept laying there, crying, and just wanted him to get out of my house." She further testified, "I kind of kept fighting him and telling him to get off of me and get out of my house. So right after that, . . . I turned my head and he was gone. So he went out. He went out through the kitchen and went out the door right there."

When the prosecutor asked Shirley if Matuzek had touched her with his penis anywhere else beside her mouth, Shirley answered, "I can't remember him doing

---

[5] On cross-examination, Shirley implied that she did not ask Matuzek to leave until after she went to her bedroom to take a nap.

[6] On cross-examination, Shirley provided largely unclear and somewhat contradictory testimony about what occurred after Matuzek entered her bedroom. In addition, when describing some events, Shirley seemingly mixed up Matuzek with a friend named Alex who slept at her apartment occasionally.

anything else.  It was, you know, the boy and girl thing, and then we ate lunch, and then that's when the other -- the penis thing started.  And then after that, he was gone."  The prosecutor next asked if Matuzek ever put his penis in Shirley's vagina.  Shirley responded, "Yes.  Yeah, he did."  Shirley said that that occurred "right before he left."  She also said it "[p]robably" occurred before he put his penis on her face.  Shirley recounted that Matuzek held her down and said, " 'Oh, you know you like it,' . . . stupid things.  And [Shirley] just sat there and cried, trying to figure out what [she was] supposed to do."  Matuzek was "just laughing and . . . acting like a little boy."  Shirley tried to get him off her so she could put on her clothes.  "It was like a little fight."

When the prosecutor asked Shirley if Matuzek had also put his mouth on her vagina, Shirley said he did.  She testified that he licked her vagina, but she did not know if Matuzek did that before or after he put his penis in her vagina.  She also said that Matuzek put his penis to her mouth "right at the end."  Shirley estimated that Matuzek had held her down for "between 25 and 50" minutes and was probably at her apartment from "lunch to 6:00 o'clock -- maybe 7:00 o'clock, but that's just kind of a guess."

After Matuzek left the apartment, Shirley cleaned up the kitchen, "threw . . . everything that was on the bed . . . in the washer," and took a shower.  Matuzek kept calling her and sending her text messages.  Shirley told him to stop contacting her and to leave her alone.

According to Shirley, a few days after the July 8 incident, she told one of her daughters about it and went to the police with her daughters.  Shirley explained (on cross-examination by Matuzek's defense counsel) that after the incident, she "didn't tell [her daughters] anything for a while because it's just too heart-breaking to get your kids knowing anything."[7]  Shirley also testified that she told the police Matuzek was missing

---

[7] At the preliminary hearing, after Shirley testified, the district attorney called Shirley's daughter Vicki as a witness.  Vicki testified that she first learned of the incident

two front teeth and she picked him out of a photo lineup. Shirley further affirmed that she told a "woman doctor" the truth about what happened.[8]

b. Trial Testimony

Shirley's daughter Tammy testified about her interactions with Shirley related to the incident. Tammy said that around 5:00 p.m. on July 8, she "Facetimed" her mother for about a minute. Shirley was lying in bed during the call and did not want to talk. Shirley's behavior was out of character, and Tammy considered it "odd" and "very strange."

On July 11, as part of their plan to move Shirley out of her Campbell apartment, Shirley's daughters transported Shirley to the Sacramento area to find her a new place to live. Tammy testified that on July 11, she and her sister Vicki went out to look at some properties while Shirley stayed at an apartment with another daughter, Sherry. When Tammy and Vicki returned to the apartment, Sherry said, " 'Mom needs to tell you guys a story. She wants to tell you about some guy.' " They sat down and said, " 'Okay, Mom. What . . . is your story?' "

In response, Shirley revealed that on July 8, a man with a bicycle said hello to her as she walked along a trail to Marshalls. Shirley and the man started talking and he said

_____

on the Saturday after it happened, when Shirley spoke about it to another one of her daughters.

[8] During her preliminary hearing testimony in July 2020, Shirley acknowledged that she sometimes experienced hallucinations. She said that "back months ago" she hallucinated "off and on" but presently her thinking was "back to more normal than it used to be." She explained that her doctor had given her medicine that reduced her hallucinations. She recalled starting on that medication "a little bit before" she met Matuzek.

At Matuzek's trial in July 2021, Tammy testified that Shirley was heavily medicated ("probably" with antipsychotic medication) at the time of the preliminary hearing. Tammy also said Shirley was "terrified" during the examination and did not want to see her assailant again. Shirley thought he "was going to get her" and that "everybody in the [court]room was making fun of her." By the time of trial, Shirley's "disease ha[d] taken over" and she could no longer recognize Tammy as her daughter.

he knew a shortcut to the shopping center. They walked to the store together. Shirley became confused when a store employee "tried to get her to open up a credit card account." The man helped Shirley pay for her purchase. After leaving the store, Shirley and the man stopped to get a cold drink and then walked back to the trail. They took a break on a bench. Shirley wanted the man to "stay there, but he continued . . . to walk with her back to her apartment." He followed Shirley into her apartment. Shirley made a sandwich for herself and offered one to the man. She was tired and went to her bed to take a nap. At that point, the man who Shirley thought was her " 'friend turned into a raving monster.' " Shirley also said that the man entered her bedroom, put his hands on her shoulders, and removed her clothes.

At this point in Shirley's disclosure, her daughters "had to ask" what further happened because Shirley "couldn't [] articulate the story." Shirley said that the man put his penis in her vagina "[a]nd when he was done with that, he came to the side of the bed, and he pushed his penis in her mouth." He "then . . . licked [her] like a dog lapping up water," and "somewhere in there he used his fingers as well." Shirley also said that the man was "dirty" and "didn't have teeth," and she described his bicycle "as being filthy with things hanging all over it."

Shirley told Tammy and her daughters that the man kept calling her and would not leave her alone. Tammy "immediately grabbed" Shirley's cell phone, examined it, and found a contact for the man and text messages between him and Shirley. Tammy called the Campbell Police Department. Shirley subsequently "repeated this story over and over and over" to Tammy.

On July 12, a sexual assault response team (SART) nurse, Nicole Rinsky, examined Shirley. Shirley told Rinsky about a July 8 sexual assault. Shirley said "she was penetrated in her vagina by a penis and a finger. She had a penis in her mouth and there was -- his oral mouth on her vagina." Shirley complained to Rinsky about tenderness at the entrance of her vaginal canal. Rinsky observed "redness and kind of

8

abraded tissue at . . . the posterior fourchette, and kind of going inside the vaginal canal."
Rinsky testified that her findings were consistent with penile and digital penetration, but
she could not make any further conclusion about whether the penetration was consensual.
Rinsky did not observe any bruising or other injuries on Shirley's body. Subsequent
forensic testing revealed that Matuzek was a possible contributor to a minor DNA profile
obtained from a sample taken by Rinsky from Shirley's neck.

On July 13, the police showed Shirley a photo lineup and interviewed her.
Thereafter, a detective engaged Matuzek in a pretext conversation via text messages on
Shirley's cell phone.[9]

On July 15, the detective arranged for Matuzek to visit Shirley's apartment. When
Matuzek arrived, the police arrested him. Although Matuzek had not been told that he
was under investigation for a sex crime, he exclaimed during the arrest, "I did not do
anything to that lady" and "I did not touch her."

---

[9] The text exchange included, inter alia, the following: After Matuzek wrote that he " 'would love to see' " Shirley, the detective asked " 'But before, I want to know why did you have sex with me when I told you to stop?' " The detective sent a few more messages and Matuzek responded, " 'I like the walking with you, touching on you just a bit to try and feel more of you. I was attracted to you when I first started talking to you. You seemed fun and wanted to enjoy the day as I wanna too [*sic*]. I like your company and sleeping with you is a gift I treasured.' " The detective replied, " 'If you treasured it, why didn't you stop when I told you to?' " Matuzek answered, " 'You did not say stop at the time or I would have. You said no before, and I stopped.' " Matuzek next wrote, " 'I took my time with you for that reason. Remember when [I] asked you to lay on your be[d] . . . []and you did with no response [] and I tasted your sweet tight pussy, and you rocked your hips to the motion [o]f [] our pleasure. Then you took me in your mouth and sucked . . . my hard cock gra[t]efully.' " Later, the detective wrote: " '[] Text me when you're on your way and don't forget a condom this time.' " " 'I just want to know that you will stop this time if I tell you to, because you didn't last time. I don't want to be sore again.' " Matuzek replied, " 'I have a condom, and I'll take more time opening you up.' "

## 2. Defense Evidence at Trial

Matuzek presented the testimony of Dr. Pamela Tabor, an expert in forensic nursing. Dr. Tabor reviewed SART nurse Rinsky's report and photographs. Dr. Tabor testified that one "would expect to find more trauma" in a case where the alleged rape victim is elderly (as compared to a premenopausal woman) because an elderly woman's vagina is "dry" and "thin" and "much easier to damage than [that of] a woman with estrogen." Dr. Tabor agreed that Shirley's injuries were consistent with both consensual and nonconsensual sex because "[t]here is no one defining factor that says this is consensual versus non-consensual. Even in women in normal [consensual] intercourse, choosing to be there can still have injuries [*sic*]."

Matuzek testified on his own behalf. He told the jury that on July 8, he was in Campbell exercising at a park. Around 10:30 or 11:00 a.m., he noticed Shirley walking by and said hi to her. She looked "really cute" in her pink outfit. Matuzek was 46 years old at the time (having been born in September 1973) and was "really surprised" to find out that Shirley was 80 given her appearance. Shirley and Matuzek began talking, and Shirley said she was going to Marshalls to buy a picture frame. Matuzek flirted with Shirley and said he would like to see her in a bikini at the beach. Shirley was friendly back to Matuzek, telling him that "she had pictures of her[self] in a bikini at her house, and [he] can go and see them." They decided to walk to Marshalls together.

On the way to Marshalls, they walked and talked for about 30 to 45 minutes. With Shirley's permission, Matuzek put his phone number in her cell phone. He entered his last name as "Park" "because she remembered [him] as the guy being at the park."

Matuzek rubbed Shirley's back as they shopped together at Marshalls. She did not ask him to stop, cringe, move away from him, or tell him to leave her alone. Matuzek believed Shirley was enjoying hanging out with him. When Shirley had a problem finding something she needed in order to apply for a store credit card, Matuzek applied

for the card to obtain a discount for Shirley.  The entire transaction took about 15 minutes.

After leaving Marshalls, Matuzek asked Shirley if she wanted something to drink because it was very hot outside.  They walked together for a bit, and Shirley waited in a shady spot as Matuzek went to buy drinks.  After he returned, they walked some more, rested on a bus stop bench, and talked about lunch.  Shirley said, " 'Come over for a sandwich.' "  Matuzek thought that Shirley liked him.  They walked "side by side" back through the park and stopped at another bench.  Shirley put her hand on Matuzek's leg.  He put his hand on her leg and kissed her.  She did not push him away.  By this point they had spent "at least three hours" together.

Matuzek and Shirley walked to her apartment.  Shirley invited him inside.  Shirley heated up bowls of corn with gravy and gave some to Matuzek, along with a grilled cheese sandwich.  While in the kitchen, Shirley said, " 'We can't have sex.  We just met today.' "  She went to her bedroom to look for a picture to place inside the frame she had purchased.  She and Matuzek looked at pictures in the bedroom, and he put a picture inside the frame for her.

They returned to the kitchen.  There, Matuzek tried to be "silly and flirtatious" with Shirley.  He touched her "waist area, hip area."  She "swatted [his] hand away, saying, 'oh, silly.' "  Shirley made an ice cream cone for Matuzek, which he took to the couch in the living room.  Shirley received a call from her daughter and spoke on the phone for about five or six minutes.  Shirley told her daughter that a friend was at the apartment, and they were looking at pictures.  After the call, Shirley made herself an ice cream cone, and she and Matuzek sat next to each other on the couch flipping through TV channels.

Matuzek kissed Shirley, knelt in front of her as she sat on the couch, rubbed her legs, and tried to pull down her pants.  "She put her hand on [his] shoulders and was kind of, like, getting into it."  Matuzek asked Shirley if she wanted to go to her bedroom "and

11

she shook her head and said yes." Matuzek grabbed Shirley's hand, helped her off the couch, put his hand on her back "being more intimate," and walked to the bedroom.

After removing the photo albums and picture frame from the bed, they began kissing. Shirley did not tell Matuzek to leave her alone or get out. She sat on the bed, and Matuzek massaged her. He knelt, kissed Shirley on parts of her body, took off her shirt and bra, and kissed her breasts. Shirley said, " 'Okay. Let's do this.' " Matuzek thought Shirley wanted to have sex with him. He wanted to have sex with her. He found Shirley to be attractive and his desire to have sex with her "[p]robably [began] when [they] were in the park."

Matuzek asked Shirley to lie down on the bed. He crawled on top of Shirley and kissed her. He got out of the bed, pulled down her pants, kissed her legs, "moved [his] way up to her vaginal area," and inserted his finger. While he orally copulated Shirley, he asked her if she was okay. Shirley pointed to his face. Matuzek "thought she was okay with it; so [he] continued with the oral sex." Shirley was not crying. She "started moving her hips back and forth like she was enjoying it."

Matuzek got up, took off his shorts, went to the side of the bed, "exposed [his] penis, put it near her face, and she opened her mouth, took [his] penis in her mouth." Shirley performed oral sex on him for about three to five minutes. Matuzek then got up off the bed even though "she probably could have kept doing it." He climbed on top of Shirley and tried to insert his penis into her but "[i]t was kind of tight; so [he] inserted [his] finger in there." Shirley allowed this to happen, and he did not hold her down. Matuzek next stood at the foot of the bed, held Shirley's knees with his arms, inserted his penis, had intercourse with her, and ejaculated. She did not tell him to stop and appeared to be enjoying it.

Shirley got up and wiped herself and the bed. She and Matuzek got dressed, and he exited the bedroom. Matuzek stayed at the apartment for about 30 more minutes. He helped Shirley clean up the dishes from lunch. She told him "some story about people

coming in her house while she's sleeping, and she wakes up, and they're in her house." He thought this was weird, and it was "one of the reasons why [he] kept texting her [asking] if she was okay." Prior to this conversation, Shirley seemed "coherent" to him.[10] After they cleaned up the dishes, Shirley received a call from her daughter.

When Matuzek started to leave the apartment at around 6:00 p.m. for a nearby light rail station, Shirley said she wanted to walk with him. As they walked, Shirley realized that she had forgotten her keys. She gave Matuzek her phone number, and he went back to the apartment with her and helped her get back inside. Regarding Shirley forgetting her keys, Matuzek explained on cross-examination that he was "not paying attention to that stuff," adding "I'm just a guy having fun, living life, man. This is ugly stuff here."

Matuzek said he texted Shirley in the days following their "date" because he wanted to "see[] how she was" and "wanted to be her friend." When the text messages began to include accusations about Shirley having said no to him, he thought it was Shirley's "daughters trying to have an issue with [him] sleeping with her or trying to be in contact with her." Matuzek was "really puzzled" because he was "getting accused of something [he] didn't do, that [he's] really against."

Later, when he returned to Shirley's apartment after the exchange of text messages, he "thought it was her asking [him] to come over." He "thought [he] was going to have lunch and kick it." When the police rushed out of the apartment, it startled him. He told the police he had not done anything to Shirley "[b]ecause they made [him] feel like [he] did something wrong" by "rushing out of her house. And, of course, from the text message, too, with the daughters or somebody -- them pretending to be Shirley. They said, 'No. You didn't stop.' And the other BS texts she tried sending me, I knew what it was. I was, like, okay. The cops are rushing out of her apartment, and I was, like,

---

[10] Matuzek testified that Shirley seemed "[c]ompletely different" when she testified at the preliminary hearing three weeks later.

I didn't do nothing wrong. I didn't rape this girl." Matuzek thought that Shirley wanted to have sex with him on July 8, and he would have stopped if he thought otherwise. He told the detectives "[o]ver and over again" that the sex was consensual. On cross-examination, Matuzek reiterated it was clear to him that Shirley wanted to have sex with him. He denied raping her.

Matuzek acknowledged having been convicted in 2000 by guilty plea for evading a police officer. On cross-examination, he further admitted having twice falsely reported a vehicle theft and evading the police in 2009.

## II.  DISCUSSION

On appeal, Matuzek asserts:  (1) the trial court erred by admitting evidence of Shirley's postcrime statements about the sexual assault; (2) the trial court erred by allowing the prosecutor in closing argument to replay and comment on a video recording of Shirley's preliminary hearing/conditional examination testimony; (3) the alleged errors cumulatively and prejudicially violated his statutory and constitutional rights; and (4) the trial court erred by denying his motion to dismiss the strike priors.

We address Matuzek's claims in turn.

### A. *Admission of Shirley's Postcrime Statements*

Matuzek contends Tammy's and nurse Rinsky's testimony about Shirley's out-of-court statements regarding the sexual assault were "erroneously introduced because: (1) the complaint was not fresh, and (2) limitations were not imposed on the lurid details as required for introduction of such hearsay." Matuzek claims that Shirley's disclosure to Tammy on July 11 was not fresh because that "conversation was not the first opportunity Shirley had to inform Tammy about the incident" and "was not in the nature of a complaint, but rather in response to questions about text messages on her phone."[11]

---

[11] In his opening brief, Matuzek does not argue specifically that Shirley's statement to nurse Rinsky was neither fresh nor a complaint. Rather, he only mentions

14

Matuzek further asserts that "Shirley's entire hearsay account was admitted without limitation on 'any further description,' " contrary to *People v. Brown* (1994) 8 Cal.4th 746 (*Brown*).  Additionally, Matuzek contends that the probative value of Shirley's statement to Tammy was outweighed by its prejudicial effect and the statement "unfairly enhanced the credibility of Shirley Doe, which calls 'into question the ultimate "integrity of the fact-finding process" ' " (quoting *People v. Herrera* (2010) 49 Cal.4th 613, 621 and *Chambers v. Mississippi* (1973) 410 U.S. 284, 295 (*Chambers*)) and "thereby diluted" the prosecution's burden of proof (citing *In re Winship* (1974) 397 U.S. 358, 364 (*Winship*)).

Regarding prejudice, Matuzek contends that the asserted errors "were not harmless because the jury acquitted [him] of rape and burglary, but the fresh complaint testimony went to the conviction for oral copulation."  In arguing prejudice, Matuzek seemingly invokes the confrontation and due process clauses as grounds for applying the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).  He further asserts that under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), "[i]f there was only a violation of state law," it is reasonably probable that a result more favorable to him would have been reached in the absence of the alleged error.

The Attorney General responds variously, including by arguing that Matuzek forfeited his constitutional claims by failing to adequately brief them on appeal, Matuzek's argument regarding the dilution of the burden of proof "is fundamentally wrong," the routine application of state evidentiary law does not implicate a defendant's

---

Rinsky's testimony under a heading that reads "the 'fresh complaint' was erroneously introduced without limitation" (boldface & capitalization omitted) and in arguing that the erroneous introduction of both Tammy's and Rinsky's testimony was prejudicial.  In his reply brief, Matuzek more fully argues that Rinsky's testimony was inadmissible because it "did not tend to shed light upon the reasons why Shirley disclosed the alleged copulation, nor 'forestall any erroneous inferences that might have arisen in the absence of that evidence' " and was not properly limited to the circumstances of the disclosure.

constitutional rights, and Matuzek's claim under state evidence law is not properly asserted under a separate argument heading.

The Attorney General further contends: "To the extent [Matuzek] asserts a claim under state law, it has some merit to it; testimony about the out-of-court complaint should have been limited to the fact that the complaint was made and the circumstances surrounding its making. However, [Matuzek] has not established he was prejudiced by the admission of additional details, so he is not entitled to reversal." More specifically, the Attorney General argues that the trial court did not abuse its discretion in admitting Tammy's testimony about the fact of Shirley's complaint and the circumstances surrounding the disclosure because that evidence was relevant in that "it corroborated Shirley's own testimony that she was assaulted." The Attorney General further argues that Matuzek's contention regarding the lack of freshness is wrong under *Brown* and his claim that Shirley's statement was not a "complaint" but a response to questions from her daughter about text messages is factually incorrect. Regarding the trial court's "error in admitting the[] details" of Shirley's complaint, the Attorney General contends that error was harmless under *Watson*.

Additionally, regarding nurse Rinsky's testimony, the Attorney General asserts, inter alia, that the trial court did not abuse its discretion in admitting that testimony because it was relevant to explain Rinsky's actions in examining Shirley.

1. Additional Background

Prior to trial, Matuzek filed a motion in limine to exclude evidence of Shirley's complaint to her daughters about the sexual assault based on "hearsay, relevance grounds, and pursuant to Evidence Code section 352." In addition, Matuzek requested a hearing under Evidence Code section 402 (hereafter 402 hearing) "to establish the details of the statements that the prosecution seeks to admit." Relying on *Brown*, Matuzek argued "the fact that Shirley Doe made a complaint to [her daughters] is not relevant to the issue of whether Mr. Matuzek assaulted her." Matuzek also asserted that "only the name of the

16

alleged perpetrator and the general nature of the allegations are admissible and not the details. [¶] Further, should the court find that the hearsay statements are admissible as fresh complaint, the prosecution should be limited to admitting the statements pursuant to the holding in *Brown*. Therefore, the defense is requesting that a limiting instruction be read to the jury at the time of the testimony that the statements are not introduced for the truth of the matter asserted. [¶] All prosecution witnesses testifying to a 'fresh complaint' should be instructed by the [p]rosecutor that his or her testimony is limited to (a) name of alleged victim; (b) name of alleged perpetrator; (3) date or time of the 'fresh' act; and (4) that the allegation was of assault without any additional details." (Boldface omitted.)

Pretrial, the trial court held a 402 hearing at which Tammy testified about the statements Shirley had made on July 11 regarding the July 8 sexual assault. At the conclusion of Tammy's testimony, defense counsel argued, "If Tammy is allowed to testify [at trial,] it should be only about that a complaint was made and the circumstances surrounding it." The court stated that it would "allow the statement made by the victim to [Tammy] as a fresh complaint." In response to the court's ruling defense counsel asked if the "entire statement" would be admitted. The court then asked the prosecutor "to review the statement he intends to offer" and said it should "be limited simply to the disclosure and the circumstances surrounding the disclosure."

Later, defense counsel requested a proffer from the prosecutor regarding Tammy's impending trial testimony about Shirley's disclosure. The prosecutor responded, "exactly what she testified to at the 402 hearing. . . . I do believe the details of the disclosure are relevant, given that what we heard in the opening, the defense [of] consent. . . . [T]he court can give a limiting instruction on the purpose of this, but it is for a non-hearsay purpose. Absolutely. I would never argue it as evidence of the crime itself, but we do need the detail in order for the jury to assess the credibility of Shirley about whether this

17

was her boyfriend or whether this was her rapist." The trial court ruled, "I will admit the disclosure as Tammy recite[d] it in the motion hearing."

In accord with her 402 hearing testimony, Tammy testified at trial about Shirley's disclosure (see pt. I.B.1.b., *ante*). The trial court did not give a limiting instruction with respect to the testimony. Neither party objected to the court's failure to give a limiting instruction during Tammy's testimony, nor requested that the court give one. Afterward, defense counsel argued that Tammy's testimony "was outside the scope of the fresh complaint rule." Counsel requested "a mistrial based on the fact that that evidence was far more prejudicial than probative, and outside the . . . fresh complaint rule that that witness was intended to be called for." The trial court denied the mistrial motion, noting that it had previously ruled on the fresh complaint issue and would give a limiting instruction to the jury concerning Tammy's testimony. The court added, "I don't believe any of the testimony provided by [Tammy] was more prejudicial than probative."

In its final instructions, the trial court instructed the jurors as follows: "During the trial, you have heard testimony from Tammy []. Tammy [] provided evidence on how Shirley Doe disclosed the initial report in this case. This evidence was admitted for a limited purpose.[12] You may consider that evidence for that limited purpose, mainly that a complaint was made. You may consider that evidence only for that purpose and for no other. You may not consider that evidence for the truth of the matter asserted."

In addition to presenting evidence about Shirley's July 11 disclosure to her daughters, the prosecutor presented testimony from nurse Rinsky about Shirley's report during the July 12 SART examination that the perpetrator had penetrated her vagina with his penis and finger, placed his penis in her mouth, and copulated her orally. (See pt. I.B.1.b., *ante*.) Rinsky gave her testimony in response to a question by the prosecutor asking Rinsky to relate the acts Shirley reported suffering. Defense counsel objected to

---

[12] As mentioned, the trial court did not give the jury a limiting instruction at the time Tammy testified.

the question on hearsay grounds.  After the prosecutor explained that the question "goes to the effect on the listener and what she does next," the trial court overruled defense counsel's objection.  Defense counsel did not request a limiting instruction following the court's ruling, and the trial court did not give one.

### 2. Legal Principles

Only relevant evidence is admissible at a trial.  (Evid. Code, § 350.)  " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (*Id*., § 210.)

"Evidence Code section 352 ' "requires the exclusion of evidence only when its probative value is substantially outweighed by its prejudicial effect.  'Evidence is *substantially* more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " ' [Citations.]  ' "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." ' " (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 811–812; see also *People v. Merriman* (2014) 60 Cal.4th 1, 70 ["[T]he admission of evidence in violation of state law may also violate due process, but only if the error rendered the defendant's trial fundamentally unfair."].[13])

"Hearsay is 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.'  (Evid. Code, § 1200, subd. (a).)  Hearsay is not admissible unless it qualifies under some exception to the hearsay rule." (*People v. Davis* (2005) 36 Cal.4th 510, 535.)

---

[13] A defendant may raise for the first time on appeal an argument that the admission of evidence in violation of Evidence Code section 352 rendered the trial fundamentally unfair in violation of due process. (*People v. Partida* (2005) 37 Cal.4th 428, 435–438 (*Partida*).)

In *Brown*, our Supreme Court ruled with respect to the fresh complaint doctrine "that 'evidence of the fact of, and the circumstances surrounding, an alleged victim's disclosure of the offense may be admitted in a criminal trial for nonhearsay purposes under generally applicable evidentiary principles, provided the evidence meets the ordinary standard of relevance.' [Citations.] The court explained that 'the admissibility of such evidence does not turn *invariably* upon whether the victim's complaint was made immediately following the alleged assault or was preceded by some delay, nor upon whether the complaint was volunteered spontaneously by the victim or instead was prompted by some inquiry or questioning from another person. *Rather*, these factors simply are to be considered among the circumstances of the victim's report or disclosure that are *relevant in assisting the trier of fact* in assessing the significance of the victim's statements in conjunction with all of the other evidence presented.' [Citation.] In other words, under *Brown*, 'freshness' is no longer one of the 'essential' prerequisites to admission under the fresh complaint doctrine." (*People v. Flores* (2024) 101 Cal.App.5th 438, 450 (*Flores*).)

As Matuzek acknowledges, "[t]he trial court is vested with broad discretion in determining the admissibility of evidence." (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 386.) "A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion, and it will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." (*People v. Wall* (2017) 3 Cal.5th 1048, 1069; see also *Flores*, *supra*, 101 Cal.App.5th at p. 449.)

"Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*Partida*, *supra*, 37 Cal.4th at p. 439.)

3. Analysis

We conclude that Matuzek has not established prejudicial error with respect to the admission of Rinsky's and Tammy's testimony about Shirley's statements to them.[14]

As for nurse Rinsky's testimony about the acts Shirley reported suffering, "[e]vidence of an out-of-court statement may be admitted for the nonhearsay purpose of showing its effect on the listener so long as that effect is relevant to an issue in dispute." (*People v. Ramirez* (2022) 13 Cal.5th 997, 1115; see also *People v. Jablonski* (2006) 37 Cal.4th 774, 820; Evid. Code, § 1200, subd. (a).)

The trial court did not abuse its discretion in admitting Rinsky's testimony based on the relevant, nonhearsay purpose of its effect on Rinsky's actions during her examination of Shirley. Before the prosecutor asked Rinsky about the assaultive acts Shirley had described, Rinsky testified that, in accord with her usual SART protocol, her examination of Shirley included a complete physical exam and inquiry about the assaultive acts. Rinsky further explained that a patient's description of the sexual assault "does help guide" (but "doesn't change") her usual procedure and clarified that "we don't necessarily collect swabs" from all parts of a patient's body. At that point in Rinsky's testimony, the prosecutor asked Rinsky to relate Shirley's description of the acts she had suffered. The trial court overruled the defense objection and allowed Rinsky to relate Shirley's description of the sexual assault.

After Rinsky recounted Shirley's statement, the prosecutor focused his examination on Rinsky's actions in swabbing Shirley for DNA. Rinsky explained, "We

---

[14] Because we address the merits of Matuzek's contentions, we need not address his alternative argument that his defense counsel provided ineffective assistance "to the extent that [counsel's] failure to object and limit the introduction of details violating *Brown* also violated due process of law." Because Matuzek's arguments fail on their merits, we also need not address the Attorney General's contention that we should apply the forfeiture doctrine based on what he characterizes as deficiencies in Matuzek's appellate briefing.

21

kind of have standard areas of the body that we always swab. And then depending on what the patient tells us, we kind of swab also in other areas. In this particular case, I swabbed both sides of her neck, around her mouth, in her mouth, each breast. . . . She mentioned she was held down [] on the sides of her shoulders; so I swabbed the sides of the shoulder area, and I did four vaginal swabs inside, but I was not able to collect a cervical swab." As mentioned *ante* (see pt. I.B.1.b.), following Rinsky's testimony, the prosecutor presented evidence about Matuzek being a possible contributor to the DNA obtained from Rinsky's swab of Shirley's neck.

Given Rinsky's preobjection testimony about the need to decide whether to swab certain areas of a patient's body, the prosecutor's question about Shirley's description of the sexual assault appropriately sought to elicit evidence related to Rinsky's decisionmaking regarding swabbing particular parts of Shirley's body, including her neck. In other words, Rinsky's testimony about Shirley's statement was relevant to her conduct in completing her examination of Shirley and why she swabbed certain areas of her body. We thus conclude the trial court did not abuse its discretion in admitting Shirley's statement to Rinsky for the nonhearsay purpose of demonstrating its effect on Rinsky's actions during the SART examination.

Furthermore, we discern no fundamental unfairness/due process violation resulting from the admission of Rinsky's relevant and non-inflammatory testimony about the assaultive acts Shirley described. (See *People v. Jones* (2013) 57 Cal.4th 899, 949; see also *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920.) In addition, assuming arguendo that Matuzek's appellate assertion of a confrontation clause violation is not forfeited by his counsel's failure to object on that ground at trial,[15] the admission of

---

[15] Although the Attorney General does not assert forfeiture, an objection on confrontation grounds is necessary to preserve a confrontation claim for appeal. (See *People v. Arredondo* (2019) 8 Cal.5th 694, 710; *People v. Burgener* (2003) 29 Cal.4th 833, 869; *People v. Catlin* (2001) 26 Cal.4th 81, 138, fn. 14; see also *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 314, fn. 3.)

Rinsky's testimony does not violate Matuzek's confrontation right because Shirley's statement to Rinsky was not offered by the prosecution for its truth. (See *Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9 (*Crawford*) ["The [confrontation] [c]lause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."]; cf. *Smith v. Arizona* (2024) 602 U.S. ___, 144 S.Ct. 1785, 1801 [testimony by one forensic expert about the testing and results of another forensic expert, which was presented "so the jury would believe it," was offered for its truth].)

Turning to Tammy's testimony about Shirley's July 11 statement, we accept the Attorney General's concession that the trial court erred under *Brown* "by not limiting Tammy's testimony" to "the fact that Shirley made the complaint and the circumstances surrounding its making." (See *Brown*, *supra*, 8 Cal.4th at p. 763.) We also agree that that error is harmless.

We are not persuaded by Matuzek's assertions that the *Chapman* standard should apply here, because Matuzek fails to demonstrate any constitutional error in the admission of Tammy's testimony about Shirley's July 11 statement.

Assuming arguendo that Matuzek preserved his confrontation clause argument for appeal, he has not established a violation of the confrontation clause because Shirley's statement to Tammy was not admitted for its truth (see *Crawford*, *supra*, 541 U.S. at p. 59, fn. 9) and was not testimonial. (See *People v. Brooks* (2017) 3 Cal.5th 1, 39 [statements to a friend "were clearly nontestimonial in nature and therefore fell outside the reach of confrontation clause protections"].)

Matuzek had the opportunity to and, in fact, did cross-examine Shirley at the preliminary hearing about her out-of-court statement to her daughters concerning the sexual assault. (See pt. I.B.1.a., *ante*.) Thus, there is no deprivation of due process based on preclusion of cross-examination. (Cf. *Chambers*, *supra*, 410 U.S. at p. 302.)

Matuzek makes no argument that the jury was misinstructed or otherwise misled about the prosecution's burden to prove his guilt beyond a reasonable doubt. Matuzek's

citation to *Winship* and his unexplained assertion that the admission of Shirley's out-of-court statement "diluted" the prosecution's burden of proof are not persuasive. Matuzek fails to explain how the admission of this evidence would have caused the jurors to apply a burden of proof less than beyond a reasonable doubt. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1010 ["The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' "].)

Regarding the question of prejudice under *Watson* (see *People v. Manning* (2008) 165 Cal.App.4th 870, 880), the trial court ultimately instructed the jurors that Tammy's testimony about Shirley's disclosure could be considered only for the limited purpose "that a complaint was made" and could not be considered "for the truth of the matter asserted." We presume the jurors understood and followed that instruction. (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) Thus, the court's limiting instruction mitigated the possibility of any prejudice resulting from the details of the sexual assault as related by Tammy. (See *People v. Rogers* (2013) 57 Cal.4th 296, 332.)

Furthermore, even assuming the jurors improperly disregarded the trial court's instruction and considered Tammy's testimony for its truth, Shirley's statement as related by Tammy was cumulative and, more importantly, contradictory to Shirley's own testimony. As detailed *ante* (pt. I.B.1.b.), Tammy testified that Shirley said the perpetrator put his penis in her vagina, then "pushed his penis *in* her mouth" (italics added), and next orally copulated her.[16] By contrast, Shirley testified that Matuzek's penis was "[m]ore like on [her] lips" (rather than in her mouth), and he "was trying to get [her] to open up [her] mouth." When the prosecutor asked Shirley if Matuzek's penis got past her teeth, Shirley said, "No, 'cause I had my mouth shut, you know. I wouldn't let that happen." When the prosecutor further inquired if Shirley had told a police officer that the man put his penis inside her mouth, Shirley said, "I don't think I told her that

---

[16] Rinsky similarly testified that Shirley had said "[s]he had a penis in her mouth."

24

much, no, whatever it was."  In addition, by contrast to Tammy's testimony, Shirley did not testify to a clear sequence for Matuzek's sex acts.  (See pt. I.B.1.a., *ante*.)  Thus, on balance, Tammy's testimony about Shirley's statement regarding the sexual assault did not wholly accord with Shirley's own testimony.

Under these circumstances, it is not reasonably probable the jury's verdict would have been more favorable to Matuzek if Tammy had been precluded from relating the details of Shirley's July 11 statement.  Tammy's testimony about Shirley having said that Matuzek placed his penis in her mouth and providing a clear sequence for the sex acts did not bolster Shirley's testimony about how and when Matuzek touched his penis to her lips/closed mouth and committed the other sex acts.  Rather, it reasonably could have served to undermine Shirley's testimony by providing the jurors a basis to question Shirley's credibility and ability to recall what in fact happened with Matuzek in her bedroom.  Given the state of the evidence, the prosecutor's argument highlighting Shirley's testimony about Matuzek's penis touching her lips, and the trial court's limiting instruction, we conclude that it is not reasonably probable that the jurors would have acquitted Matuzek of oral copulation by force, violence, or fear on count 4 or simple battery on counts 2 and 3 if they had not heard the details Tammy provided.  For these same reasons, Tammy's testimony was not substantially more prejudicial than probative and did not render Matuzek's trial fundamentally unfair.  (See *Partida*, *supra*, 37 Cal.4th at p. 435.)

### B.  *Prosecutor's Use of and Comments on Shirley's Former Testimony*

Matuzek contends, "The trial court erred by permitting the prosecution to circumvent the limitations on the [conditional] examination during closing argument as though [Shirley] testified at trial."  He also maintains that "[m]anipulation of the conditional examination recording unfairly enhanced the jury's belief in Shirley's credibility."  Matuzek further asserts that his defense "counsel's objections were overruled" and any request for a curative instruction would have been futile.

25

Alternatively, Matuzek claims his defense counsel was ineffective in failing to "cite grounds in accordance with the objective standard of reasonableness," "move to exclude the replaying of the video recording at closing argument in line with Evidence Code section 1291," and request admonishments.  Lastly, Matuzek claims "[t]he error was not harmless in light of the disputed issues of fact requiring multiple days of deliberations before [he] was acquitted of more serious charges.  [Citation.]  A new trial is warranted where limitations on use of the conditional examination, and proscriptions on prosecutorial vouching, are enforced at closing argument."

The Attorney General responds that the "nature of [Matuzek]'s claim is not entirely clear" but construes the claim as alleging prosecutorial error in closing argument.  The Attorney General contends that Matuzek forfeited his claim by failing to object and request admonitions.  The Attorney General further asserts that defense counsel's failures do not amount to deficient performance or prejudicial ineffective assistance.

### 1.  Additional Background

On July 29–30 (three weeks after the incident), Shirley testified for the prosecution at the preliminary hearing.  The trial court granted the district attorney's request to record a video of Shirley's testimony and deem her testimony a conditional examination (§ 1339).

Pretrial, the prosecutor moved under Evidence Code sections 240 and 1291 to play Shirley's preliminary hearing/conditional examination testimony at trial.  Matuzek, likewise, filed a motion objecting to the admission of the former testimony, requesting a 402 hearing, and seeking a stipulation regarding the reason for Shirley's unavailability "[i]f the conditional examination is played."

In July 2021, the trial court held a 402 hearing at which Tammy testified about Shirley's condition.  The court found that Shirley was unavailable to testify at trial due to her cognitive impairment (Evid. Code, § 240).  The court granted Matuzek's request for a stipulation regarding Shirley's unavailability.

26

During jury selection, defense counsel requested that the prosecutor provide the jurors a transcript of Shirley's prior testimony when playing the video. The trial court ruled that the prosecutor must offer the transcript and video recording into evidence, but the court did not require the prosecutor to provide the transcript to the jurors while playing the video.

At trial, the trial court informed the jurors that Shirley was "presently unavailable to testify due to an existing mental illness or infirmity" and her "infirmity is not the result of any allegations stated in the information." Thereafter, the prosecutor played a redacted version of the video recording of Shirley's preliminary hearing/conditional examination testimony.[17] The court ultimately admitted the redacted video recording and transcript into evidence.

In its final instructions, the trial court instructed the jurors in several respects regarding Shirley's former testimony. The court told the jurors that they must evaluate Shirley's testimony "by the same standards that you apply to a witness who testified here in court." Additionally, the court instructed the jurors with the pattern instruction regarding factors relevant to witness credibility (CALCRIM No. 226).

Near the beginning of his closing argument, the prosecutor told the jurors that their "role in this case is to be the credibility determiner. Only one person could be telling the truth, Shirley or Mr. Matuzek, and it is your job to reject the unreasonable. Reject his story for the reasons I will explain; realize that Shirley has no reason to make this up." Defense counsel objected to the prosecutor's remark on the ground of "[i]mproper argument." The trial court overruled the objection.

---

[17] Prior to admission of the video, the trial court and counsel for the parties resolved several objections to certain portions of Shirley's prior testimony. These rulings resulted in the redacted video recording and corresponding transcript, which were admitted into evidence.

Later in his argument, the prosecutor told the jurors (without any defense objection) that they watched Shirley's recorded testimony because the prosecutor wanted them "to assess [Shirley's] credibility." After noting that the transcript of Shirley's testimony would be available to the jurors, the prosecutor said he was "going to play some videos" and ask the jurors "to watch [Shirley] testify again." The prosecutor next directed the jurors to a portion of the transcript "as an example of how there was oral copulation in this case," in particular when Shirley testified that Matuzek's penis was " '[m]ore like on [Shirley's] lips and trying to push.' "

The prosecutor subsequently noted that both the video recording and transcript were in evidence and available for the jurors to watch and read. The prosecutor further reiterated that "[c]redibility can only be determined" by watching a witness testify, arguing: "It doesn't really leap off paper. You have to watch and see how people testify. And that's why you're forced -- forced -- why we played this video for you and didn't give you a transcript yet of Shirley. I wanted you to watch this video. I wanted you to see. I wanted you to assess whether this woman is a deranged liar trying to pin four serious crimes on a man." Defense counsel interjected with an objection on the ground of improper argument. The trial court overruled the objection.

Later, the prosecutor said, "So let's watch. I want you to assess her credibility. Look at this woman. Is she lying? Let's review." The prosecutor then played 16 video clips from Shirley's recorded testimony.[18]

Near the end of his argument, the prosecutor stated, "This case is about credibility. I said this on day one. This is about whether this is conspiracy by Shirley to frame an innocent man in her, you know, frankly, it seems like the last years of her life, or --."

---

[18] The trial court subsequently told the jurors to disregard one of the 16 clips. That clip had not been admitted into evidence and had been erroneously played by the prosecutor in closing argument. On appeal, Matuzek does not specifically challenge the playing of the unadmitted excerpt.

28

Defense counsel interrupted, objecting on the ground of improper argument. The trial court overruled the objection.

After the prosecutor and defense counsel completed their initial closing arguments, defense counsel noted for the record that the trial court and counsel had discussed "in chambers," before closing arguments the prosecutor's desire to play portions of Shirley's recorded testimony. Defense counsel said her "position was that if that testimony was supposed to be treated like any other trial testimony, then it should not be played back in closing. Instead, it should just be argued, because the other witnesses in this trial were not videotaped, and we couldn't play back snippets of their testimony either." Defense counsel recounted that the court had indicated it would allow the prosecutor to play the video clips during his closing argument. Neither the court nor the prosecutor commented on counsel's recounting of her in-chambers objection and the court's ruling.

2. Analysis

Regarding Matuzek's contention that the trial court erred in permitting the prosecutor to replay the video recording of Shirley's prior testimony, we decide that contention is adequately preserved for appellate review. Defense counsel placed on the record her earlier, in chambers objection to the prosecutor replaying Shirley's recorded testimony, asserting that the testimony should be "treated like any other trial testimony" that was not recorded on video. Because the court ruled prior to closing argument that the prosecutor could play clips of Shirley's testimony, any further objection by defense counsel to the clips during the prosecutor's argument itself almost certainly would have been futile. (See *People v. Hill* (1998) 17 Cal.4th 800, 820; see also *People v. Peoples* (2016) 62 Cal.4th 718, 801 (*Peoples*).)

Turning to the merits of Matuzek's contention, Matuzek states that there is "no case law addressing how replaying of conditional examination testimony during closing argument treats such witnesses differently than those who testify at trial." Further,

relying on Evidence Code section 1291, subdivision (b) (hereafter Evidence Code section 1291(b)), Matuzek argues that "replaying of the video recording during closing argument, rather than reliance on the transcript, unfairly enhanced Shirley Doe's conditional examination beyond the limitations requiring that she be treated as if she testified at trial like every other witness under the Evidence Code."

We are not persuaded. Sections 1343 and 1345 permit, respectively, the video recording of the testimony of a conditionally examined witness and the playing of the video recording at trial.[19] Evidence Code section 1291 creates an exception to the hearsay rule for former testimony by an unavailable witness. (See Evid. Code, § 1291, subd. (a).) Evidence Code section 1291(b) provides: "The *admissibility* of former testimony under this section *is subject to the same limitations and objections as though the declarant were testifying at the hearing*, except that former testimony offered under this section is not subject to: [¶] (1) Objections to the form of the question which were not made at the time the former testimony was given. [¶] (2) Objections based on competency or privilege which did not exist at the time the former testimony was given." (Italics added.)

We do not agree with Matuzek's contention that Evidence Code section 1291(b) prohibits a party from playing recorded former testimony in closing argument. By its own terms, Evidence Code section 1291(b) addresses the *admissibility* of former testimony, not whether or how that evidence may be presented after admission. Because

---

[19] Section 1343 provides: "The testimony given by the witness shall be reduced to writing and authenticated in the same manner as the testimony of a witness taken in support of an information. Additionally, the testimony may be video-recorded." Section 1345 provides: "The deposition, or a certified copy of it, may be read in evidence, *or if the examination was video-recorded, that video-recording may be shown by either party at the trial if the court finds that the witness is unavailable as a witness within the meaning of [s]ection 240 of the Evidence Code*. The same objections may be taken to a question or answer contained in the deposition or video-recording as if the witness had been examined orally in court." (Italics added.)

Evidence Code section 1291(b) is inapposite and Matuzek makes no other persuasive argument that the trial court erred in overruling his objection to the prosecutor playing clips of Shirley's recorded preliminary hearing testimony, we conclude the trial court did not abuse its discretion in permitting the prosecutor's conduct.  (See *People v. Nadey* (2024) 16 Cal.5th 102, 153 ["A trial court has not only the power but 'the duty . . . to control all proceedings during the trial,' including the arguments of counsel.  [Citations.] It is accordingly given broad inherent and statutory discretion to limit both the length of argument and the matters addressed."]; *People v. Edwards* (2013) 57 Cal.4th 658, 743 [applying an abuse of discretion standard when reviewing a trial court's ruling sustaining an objection during closing argument].)

Matuzek makes two further, summary arguments that appear to assert prosecutorial misconduct.  Specifically, Matuzek states:  "The presentation of the video recording and concomitant editorialization by the prosecution went far beyond what has been permitted in other cases.  (See, e.g., *People v. Mays* (2009) 173 Cal.[A]pp.4[t]h 1145, 1159[20] . . . .)  The editorializing also vouched for the credibility of Shirley Doe. [Citation.]"  Matuzek does not provide any citation to the record to support his former assertion of alleged improper "concomitant editorialization" that exceeded conduct permitted by precedent.  As for his latter assertion of vouching, Matuzek cites a portion of the prosecutor's closing argument in which the prosecutor said (over a defense objection) that he wanted the jurors to watch Shirley's testimony "to assess whether this woman is a deranged liar trying to pin four serious crimes on a man."

Regarding forfeiture, Matuzek argues his contentions "have been preserved to the extent that further requests to exclude the evidence would have been futile [citation]; or objections would have been unable to cure the prejudice."  Alternatively, he asserts that

---

[20] We note that the case Matuzek cites was withdrawn from the official reporter and republished as modified on denial of rehearing.  (See *People v. Mays* (2009) 174 Cal.App.4th 156 (*Mays*).)

his defense counsel provided ineffective assistance of counsel based on "the omission of objections based on constitutional rights" and "counsel's failure to argue that the replaying of the conditional examination video recording must be limited by 'put[ting] the onus of an adverse ruling on the trial judge rather than h[er]self.' "

As for Matuzek's first argument regarding "concomitant editorialization," assuming arguendo that it was preserved for appellate review, Matuzek's argument fails to persuade us that the prosecutor's unspecified editorialization "went far beyond what has been permitted in other cases." Not only does Matuzek fail to support his assertion with any citation to the record, but he also cites to a withdrawn appellate opinion. Moreover, the published decision in *Mays* makes no mention whether the admitted videotaped testimony was played during closing argument. (See *Mays*, *supra*, 174 Cal.App.4th at p. 170.) The *Mays* decision simply says, "The videotaped testimony of [the witness] was played for the jury in open court." (*Ibid*.)

"[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609; see also *People v. Dauterman* (2024) 104 Cal.App.5th 603, 609.) Because Matuzek has not carried his burden to show error based on alleged improper "concomitant editorialization" that "went far beyond what has been permitted in other cases," we must reject that contention.

As for Matuzek's second argument regarding improper vouching by the prosecutor, assuming arguendo that that contention was preserved for appellate review, Matuzek's argument fails to persuade that the prosecutor's alleged "editorializing" when urging the jurors to watch Shirley's testimony and "assess whether [she] is a deranged liar" vouched for her credibility.

" ' "[A] prosecutor is given wide latitude to vigorously argue his or her case" ' [citation] and ' "may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' " ' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.)  " 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' [Citation.]  Referring to facts not in evidence is 'clearly' misconduct 'because such statements "tend[] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination." ' " (*Ibid.*)

The remark that Matuzek identifies as improper does not amount to vouching. The prosecutor explained the importance of viewing the demeanor of witnesses while they are on the stand and why he wanted the jurors to watch Shirley's recorded testimony, namely, to assess her credibility.  The prosecutor's argument did not suggest he possessed extra-record evidence bolstering Shirley's credibility.  Nor did it invoke the prosecution's prestige or reputation.  Because there was no improper vouching in the remark Matuzek identifies, we conclude the trial court did not abuse its discretion by overruling Matuzek's objection to the prosecutor's argument.  (See *Peoples*, *supra*, 62 Cal.4th at pp. 792–793; *People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

Matuzek seemingly makes two additional assertions of improper vouching in a section of his opening brief that addresses the prejudice resulting from the errors alleged earlier in his claim.  Regarding his first additional assertion, Matuzek states that "the prosecutor vouched for Shirley by telling the jury, '[r]ealize that Shirley has no reason to make this up.' "[21]  In his second assertion, Matuzek says, "Rhetorically, the prosecution

_____

[21] As described more fully *ante* (pt. II.B.1.), at the beginning of his closing argument, the prosecutor told the jurors they were the "determiner" of witness credibility

questioned: 'Is this the Academy Awards?'[22]  [Citation.]  In doing so, the prosecution unfairly vouched for Shirley Doe's conditional testimony via the video recording."

Assuming arguendo that Matuzek's two additional assertions of vouching are neither forfeited by a failure to object at trial nor inadequately raised in this appeal (cf. *In re S.C.* (2006) 138 Cal.App.4th 396, 408), when viewed in context, Matuzek fails to persuade us that the identified remarks amount to improper vouching.  Here, again, the prosecutor did not suggest that he had any extra evidence bolstering Shirley's credibility or invoke the prosecution's prestige or reputation.  Rather, the prosecutor focused the jurors on their role as the judge of witness credibility and argued why they should believe Shirley over Matuzek.  Under these circumstances, we decide that neither of the additional challenged remarks amounts to improper vouching and, in turn, the trial court did not abuse its discretion in overruling the defense objection to the first remark.

In sum, Matuzek has not demonstrated reversible error arising from the prosecutor's use of Shirley's recorded former testimony or his related remarks in closing argument.[23]

## C.  Cumulative Prejudice

Although we have concluded that the trial court erred by failing to limit Tammy's testimony about Shirley's July 11 statement under *Brown*, we found no prejudice (see pt. II.A.3., *ante*), and Matuzek has not demonstrated any other error in his trial.  Thus, there

___

and then urged the jurors to "[r]eject" Matuzek's story for reasons that would be explained and "realize that Shirley has no reason to make this up."

[22] The complete comment made by the prosecutor after he showed a video clip reads:  "That's the single witness rule in a nutshell right there, folks.  Nobody is around. She is testifying.  The point is for Mr. Matuzek is that nobody is around.  That's how you get away with a crime like this.  As Shirley sits there and she tells you she's crying and wondering what to do, ask yourself:  Is she lying?  Is this an act?  Is this the Academy Awards?"  Defense counsel did not object to the reference to the Academy Awards.

[23] Because we have addressed the merits of Matuzek's contentions, we need not consider his alternative ineffective assistance of counsel claim.

are no errors to consider cumulatively.  (See *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

### D. Motion to Dismiss Prior Strikes

Matuzek contends:  "The childhood and psychological trauma that he endured up to the time of the charged acts, including the devastating traumatic head injury that contributed to the offenses so as to justify dismissal [*sic*] of the 'Three Strikes' allegation in light of the Legislature's amendment of section 1385.  [Citation.]  Instead, the trial court erroneously applied the statutory factors, but also erred by disregarding disputed facts in the record while faulting [Matuzek] for not accepting responsibility (although he did).  [Citation.]  The erroneous application of section 1385 warrants reversal for resentencing in line with due process of law."

The Attorney General responds that section 1385, subdivision (c) (hereafter section 1385(c)) does not govern a trial court's discretion to dismiss a prior strike.  The Attorney General further contends that even if it did, a court could rationally conclude that Matuzek's strikes should not be dismissed because a more lenient sentence would endanger public safety.  Thus, the trial court did not abuse its discretion by declining to dismiss Matuzek's prior strikes.

#### 1.  Additional Background

After the jury convicted Matuzek, the trial court found that Matuzek had been convicted previously (in 1993 and 1995) of two strike priors for first degree burglary (§§ 459, 460, subd. (a)) within the meaning of the Three Strikes law.

The probation officer's presentence report stated that Matuzek's score of "4" (boldface omitted) on the Static-99R (a risk assessment instrument) showed that he had an above-average risk of reoffending relative to other adult male sex offenders.  The probation report further noted that, in addition to Matuzek's two strike priors, he had five prior felony convictions (i.e., four second degree burglary convictions and a conviction for evading a police officer) and 17 prior misdemeanor convictions.  The probation

35

officer identified no mitigating factors and opined: "As for an appropriate disposition, although the age of [Matuzek]'s [s]trike prior offenses exceeds twenty years, he has only incurred one non-violent [f]elony conviction since his most recent [s]trike prior offense and he appears to have had a somewhat stable living and employment situation at the time of the present matter, given the vulnerability of the victim coupled with the serious nature of the acts perpetrated against the victim, Mr. Matuzek does pose a significant risk to the community. Mr. Matuzek's behavior in the present matter and the impact his actions have had on both the victim and her family far outweigh any potentially mitigating factors that may be present." The probation officer recommended a sentence of 25 years to life.

Matuzek filed a *Romero* motion asking the trial court to dismiss one or both strike priors in the furtherance of justice and/or pursuant to section 1385 as amended by Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill 81) (Stats. 2021, ch. 721, § 1).[24] Matuzek contended that sentencing him "pursuant to the 'Three Strikes' law would not be in the interest of justice as applied to the facts of this case and the individualized factors" (italics omitted) pertaining to him. Matuzek explained that, following his "last release from custody, he successfully completed probation. He was trying his best, despite numerous limitations including (1) being homeless, (2) suffering a traumatic brain injury, and (3) having little to no family support. It was against these odds that [he] was able to become sober, obtain gainful employment as a dish washer at Google, afford to rent a room in a home, purchase a vehicle, and have enough money to buy food and clothing. Since 2008, [he] has worked hard to leave his criminal lifestyle behind him. It is for these reasons that he is so desperate for the [c]ourt to understand what he experienced on the day that led to the charges now before th[e] [c]ourt." Regarding his

---

[24] The Legislature has amended section 1385(c) twice since enacting Senate Bill 81, but the more recent changes to section 1385(c) do not affect our analysis of Matuzek's claim. (See Stats. 2022, ch. 58, § 15; Stats. 2023, ch. 131, § 160.)

strike priors, Matuzek said that he "was convicted for breaking/entering into a garage and stealing a bicycle that he then sold and used the proceeds for food and drugs."

The prosecutor opposed Matuzek's *Romero* motion. The prosecutor argued that Senate Bill 81 "did not repe[a]l the Three Strikes [l]aw" and does not mandate the dismissal of Matuzek's strike priors. The prosecutor further asserted that the only mitigating circumstance listed in section 1385(c) "that relates is that the prior strikes are more than five years old, but as a recidivist and danger to public safety, this factor does not take Mr. Matuzek out of the spirit of the Three Strikes [l]aw."

At the February 2022 sentencing hearing, the trial court noted that it had reviewed and considered Matuzek's *Romero* motion, the prosecutor's sentencing memorandum and response to the defense motion, and the probation officer's report.[25] After hearing further argument from counsel, the court denied Matuzek's motion. The court noted that its "sole function" was to decide Matuzek's sentence based on his conduct. The court added, "I will tell you, [defense] counsel, . . . what worries this court so much is that I don't believe that Mr. Matuzek believed he has done anything wrong, and in my mind, that's a reflection of the lack of insight, and there's many reasons, perhaps, why that is or is not the case." The court observed that this case involved "a high degree of cruelty to a woman who [was] suffering from dementia" and Matuzek took "advantage" of that in committing a crime that "was predatory in nature." The court concluded, "I do not believe this is a case that falls outside the spirit of the Three Strikes law, even in light of the new [Senate Bill] 81." The court added with respect to the sentence, that it would follow the probation officer's recommendation and noted Matuzek's score on the Static-99R.

After the trial court ruled on the *Romero* motion, Matuzek asked to read a letter he had written and said, "I was wrong for sleeping with Shirley because of her age, her

---

[25] The same bench officer presided over the trial and sentenced Matuzek.

dementia. I did not know she had dementia. It wasn't noticeable to me." The court permitted Matuzek to read his letter "[t]o Shirley and her family," which included the following: "I would like to sincerely apologize for this disturbance in your life. . . . To be honest, it's hard to apologize for a charge I did not do, but I am remorseful for crossing the line, moral-wise, not paying attention to her age or thinking of her mental capacity, nor did I think of how her family would think of me, such as just meeting me and bringing me into her home. . . . I made a big mistake with sleeping with Shirley because [of] her age and being vulnerable. I did not think of the ugliness of taking advantage of her age or her being vulnerable. That was not the case. I like Shirley. I liked the company. Since my girlfriend and I were on a break for two weeks, Shirley filled the void of . . . not talking and doing fun stuff. . . . I have no or had no intention of taking advantage of the elderly. I considered Shirley nice, sweet, and cute. . . . I did not know Shirley had dementia. . . . [¶] . . . [¶] Again, I'm sorry for the whole event and the way it took a turn. I hope Shirley is doing okay and I am not upset with her."

The trial court told Matuzek that it appreciated his statement and believed "it was thoughtful." Matuzek then continued, addressing several things including his employment history, prior homelessness, and criminal history. The court responded: "I want to let you know that I have considered that. Your attorney has detailed all of your history, the fact that you were able to get employment, were sober for quite some time, notwithstanding the challenges in your case as a child. She has shown me that you have had the ability to maintain stable employment, and just as you mentioned, working sufficiently to take care of yourself. Those are all very valid, very positive, wonderful things about you; so the court is not ignoring all of that. I am simply saying what I am finding to be most significant. So this does not disregard any of the hard work that you have completed or achieved or accomplished. Again, I am not commenting on whether I agree you are a bad person or a good person. I'm here only to sentence you."

The trial court proceeded to sentence Matuzek to 25 years to life on count 4 (oral copulation by force, violence, or fear).

### 2. Analysis

Section 1385, subdivision (a) authorizes trial courts to dismiss an action "in furtherance of justice." (§ 1385, subd. (a).) In *Romero*, the California Supreme Court held that a trial court's discretion under section 1385, subdivision (a) includes the power to dismiss a prior conviction alleged under the Three Strikes law. (*Romero*, *supra*, 13 Cal.4th at pp. 529–530; see *People v. Williams* (1998) 17 Cal.4th 148, 158 (*Williams*) [a court may "strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony"].)

Section 1385, subdivision (b) pertains to sentence enhancements. It states, "If the court has the authority pursuant to subdivision (a) to strike or dismiss an enhancement, the court may instead strike the additional punishment for that enhancement in the furtherance of justice in compliance with subdivision (a)." (§ 1385, subd. (b)(1).)

Senate Bill 81 "added subdivision (c) to section 1385, effective January 1, 2022, allowing the trial court to dismiss any enhancement 'in the furtherance of justice' [citation] unless otherwise prohibited, and providing that nine enumerated mitigating circumstances . . . 'weigh[] greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.' " (*People v. Walker* (2024) 16 Cal.5th 1024, 1030–1031.)

We review de novo, as a matter of statutory interpretation, whether the amendments to section 1385 enacted by Senate Bill 81 apply to prior strikes under the Three Strikes law. (*People v. Burke* (2023) 89 Cal.App.5th 237, 242 (*Burke*).)

California "appellate courts have routinely rejected the argument that the 'Three Strikes' law constitutes an enhancement under section 1385(c), concluding it is 'well established' that the law is instead 'an alternative sentencing scheme for the current offense.' [Citations.] In reaching this conclusion, these courts have 'presume[d] the

Legislature was aware of, and acquiesced in, both this established judicial definition of enhancement and the distinction between an enhancement and an alternative sentencing scheme such as the Three Strikes law. [Citation.] The Legislature did not otherwise define the word "enhancement" in section 1385.' [Citations.] Yet, '[i]f the Legislature had wanted section 1385, subdivision (c) to apply to prior strikes as well as to enhancements as legally defined, it would have said so.' " (*People v. Serrano* (2024) 100 Cal.App.5th 1324, 1338; accord, *People v. Olay* (2023) 98 Cal.App.5th 60, 64–69 (*Olay*) [holding § 1385(c) does not apply to prior strikes]; *Burke*, *supra*, 89 Cal.App.5th at p. 244 [§ 1385(c) "applies only to an 'enhancement,' and the Three Strikes law is not an enhancement"]; *People v. Dain* (2024) 99 Cal.App.5th 399, 411, review granted May 29, 2024, S283924; see also *People v. McDowell* (2024) 99 Cal.App.5th 1147, 1154 [Senate Bill 81 does not apply to the penalty provision in § 236.1, subd. (c)(2), which prescribes an alternate punishment for the offense].)

We are not persuaded by Matuzek to reach a conclusion contrary to the holdings of the other Courts of Appeal. We agree that section 1385(c)'s provisions governing dismissal of an enhancement do not apply to the Three Strikes law.[26] (*Burke*, *supra*, 89 Cal.App.5th at p. 244; *Olay*, *supra*, 98 Cal.App.5th at p. 69.)

To the extent that Matuzek further contends the trial court abused its discretion "in denying the *Romero* motion without identifying material mitigating evidence in the record," that contention is not persuasive.

"The purpose of the Three Strikes law is 'to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of serious and/or violent felony offenses.' " (*In re Young* (2004) 32 Cal.4th 900, 909.) "In ruling on a *Romero* motion, the court must consider whether 'the defendant may be

---

[26] Because we conclude that section 1385(c) does not apply to Matuzek's strike priors, we do not address his related claim of a due process violation based on alleged arbitrary "implementation of amended section 1385."

deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' [Citation.] Thus, the Three Strikes law establishes a 'strong presumption' in favor of a harsher sentence and requires the court to explicitly articulate its reasoning if it is to depart from a harsher sentence by granting the *Romero* motion." (*People v. Salazar* (2023) 15 Cal.5th 416, 428; see also *Williams*, *supra*, 17 Cal.4th at p. 161 [the considerations for striking a prior strike include "the nature and circumstances of [] defendant's present felonies and prior serious and/or violent felony convictions, and the particulars of [defendant's] background, character, and prospects"].)

"We review the denial of a motion to dismiss a strike allegation for abuse of discretion. [Citation.] Abuse of discretion in failing to strike a prior conviction occurs in limited circumstances: where the trial court is not aware of its discretion; where the trial court considers impermissible factors; or where applying the Three Strikes law would produce an arbitrary, capricious, or patently absurd result under the specific facts of a particular case. [Citation.] A reviewing court's disagreement with the trial court's weighing of proper factors (as distinct from the trial court's reliance on improper factors in the weighing process) does not constitute an abuse of discretion." (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1029.)

"While a court must explain its reasons for striking a prior [citations], no similar requirement applies when a court declines to strike a prior." (*In re Large* (2007) 41 Cal.4th 538, 550.) "The absence of such a requirement merely reflects the legislative presumption that a court acts properly whenever it sentences a defendant in accordance with the three strikes law." (*People v. Carmony* (2004) 33 Cal.4th 367, 376.) Here, before ruling on Matuzek's *Romero* motion, the trial court stated that it had reviewed the motion, which detailed Matuzek's social history and mitigating circumstances. Moreover, after Matuzek spoke at sentencing, the court confirmed that it had considered his history as detailed by defense counsel. We must presume the court considered all

41

relevant factors before it "in the absence of an affirmative record to the contrary." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.) Because there is no indication in this record that the trial court failed to consider Matuzek's asserted mitigation, Matuzek has not demonstrated that the court abused its discretion in denying his *Romero* motion.

Matuzek further contends the trial court erroneously faulted him for not showing remorse and failed to "take into account [his] apology 'as a mitigating circumstance.' " We are skeptical of the factual accuracy of this assertion, given that the court commented favorably on Matuzek's statement at sentencing in which he characterized his actions as a "big mistake." Nevertheless, assuming arguendo that the court impermissibly considered lack of remorse in denying Matuzek's *Romero* motion,[27] the court provided other reasons for not striking the prior strikes in the furtherance of justice, namely, Matuzek's cruelty toward a vulnerable person and the predatory nature of his present offense. These reasons adequately and independently support the trial court's decision that Matuzek fell within the spirit of the Three Strikes law. We thus decide that any error related to Matuzek's remorse and apology was harmless. (See *People v. Leonard* (2014) 228 Cal.App.4th 465, 503–504.)

### III. DISPOSITION

The judgment is affirmed.

---

[27] See *People v. Weber* (2013) 217 Cal.App.4th 1041, 1064, fn. 7 ("Lack of remorse can be used to aggravate a sentence ' "unless the defendant has denied guilt and the evidence of guilt is conflicting." ' "); but see *People v. Nunez* (2023) 97 Cal.App.5th 362, 373 (finding no abuse of discretion in denying a *Romero* motion where the trial court considered the defendant's "lack of remorse as relevant to his character, future prospects, and improbability of rehabilitation, not as a result of any sort of antipathy toward" the defendant and also considered the severity of the crime and the defendant's criminal history).

_____
Danner, J.

WE CONCUR:

_____
Greenwood, P. J.

_____
Grover, J.

**H049792**
*People v. Matuzek*